UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DONALD FREELAND, et al., | Case No. 25-cv-01240-EKL |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| NIPPON STEEL CORP., et al., | Re: Dkt. No. 69 |
| Defendants. | |

Consumer plaintiffs originally brought this antitrust action to enjoin the acquisition of U.S. Steel by Nippon Steel.  Plaintiffs claimed that the merger would increase concentration in the alleged market for United States steel manufacturing, triggering a host of anticompetitive consequences:  higher prices, lower output, and reduced choice and innovation.  The Court dismissed the original complaint for lack of antitrust standing and for failure to state a claim.  In their amended complaint, Plaintiffs now seek a divestiture of the consummated merger. Defendants again move to dismiss, raising substantially the same arguments as before.  The Court carefully reviewed the parties' briefs and relevant authority and heard argument on the motion. Because Plaintiffs lack antitrust standing, and because they failed to cure the pleading deficiencies identified in the Court's prior Order, Defendants' motion is GRANTED and the complaint is dismissed without leave to amend.

## I.    BACKGROUND

This case arises from Defendant Nippon Steel Corp.'s acquisition of U.S. Steel.  According to the complaint, Nippon Steel is "the fourth largest steel producer in the world."  First Am. Compl. ¶ 7, ECF No. 66 ("FAC").  U.S. Steel is alleged to be "the 3rd largest United States based steel manufacturer" by market share.  *Id.* ¶ 15.  "U.S. Steel manufactures . . .  steel and supplies

customers throughout the world primarily in the automotive, construction, consumer (packaging and appliance), electrical, industrial equipment, service center/distribution, structural tubing and energy (oil country tubular goods (OCTG) and line pipe) markets." *Id*. ¶ 11.

Plaintiffs are consumers of products that contain steel. *Id*. ¶ 13. "More specifically, each Plaintiff owns one or more automobiles, rents or owns their own residences that incorporate steel products and goods including metal structural members, fasteners and appliances, purchases and utilizes consumer packaging, metal tools and similar consumer items made of steel, including knives, forks and spoons, and potentially and probably will have the need to buy consumer steel products in the future." *Id*. ¶ 30. Plaintiffs claim that allowing the merger to persist "will likely result in substantially less competition" and threatens "damage to Plaintiffs and other direct and indirect consumers of steel products." *Id*. ¶ 7. The merger "substantially and directly threaten[s] the Plaintiffs with the likelihood of increased prices of steel products and diminishing steel supply that will have a ripple effect . . . through critical consumer goods, including those used in the United States automobile, construction, home appliances and agriculture industries." *Id*. at 3.

Plaintiffs assert a single claim for violation of § 7 of the Clayton Act, asking the Court to order a divestiture of the merger.[1] The Court previously denied Plaintiffs' motion for a temporary restraining order because Plaintiffs failed to plausibly state a claim, much less raise a serious question on the merits of the case. Order Denying TRO, ECF No. 60. The Court also granted Defendants' motion to dismiss the original complaint with leave to amend. *Freeland v. Nippon Steel Corp.*, No. 25-cv-01240-EKL, 2025 WL 1724997 (N.D. Cal. June 20, 2025) ("MTD Order"). The amended complaint asserts the same claim as before based on the same legal theory, with a few new factual allegations. Defendants move to dismiss the case for lack of Article III standing and for failure to state a claim. Mot. to Dismiss, ECF No. 69 ("Mot.").

## II.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a complaint if the court lacks subject matter jurisdiction. Plaintiffs must demonstrate Article III standing for each

---

[1] On June 18, 2025, Defendants closed the merger transaction. *See* Admin. Mot. to Vacate the TRO Hr'g at 2, ECF No. 55.

claim and for each form of relief sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). To establish Article III standing, Plaintiffs must show that they "[have] suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). A plaintiff seeking injunctive relief must demonstrate "a substantial risk of future injury." *Id*. at 68. "[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.' And it consequently does not show standing." *Carney v. Adams*, 592 U.S. 53, 58 (2020).

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To avoid dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

## III. DISCUSSION

Defendants move to dismiss the complaint on several grounds. First, Defendants argue that Plaintiffs lack Article III standing to challenge the merger. Second, Defendants contend that Plaintiffs lack antitrust standing because they are not participants in the alleged market for steel – rather, they are purchasers (or users) of various downstream products that contain steel. Third, Defendants contend that Plaintiffs fail to plausibly allege that the merger violates Clayton Act § 7, which prohibits mergers where the effect "may be substantially to lessen competition, or to tend to

United States District Court
Northern District of California

3

create a monopoly." 15 U.S.C. § 18. The Court addresses these issues in turn.

### A.    Article III Standing

The Court previously rejected Defendants' argument that Plaintiffs lack Article III standing because their "injuries are not sufficiently particularized." MTD Order at *2. The Court reasoned that "Plaintiffs have articulated an injury that is personal to each of them in the form of out-of-pocket losses" because they "use or purchase products containing steel," and they allege "that the price of these products may increase because of the merger." *Id*. at *3. Therefore, Plaintiffs claim "more than a generalized interest in enforcement of the antitrust laws." *Id*. Now, Defendants focus on the other two requirements of Article III standing – traceability and redressability. *See* Mot. at 6-10; *see also* MTD Order at *3 (anticipating that "traceability will be particularly hard for these Plaintiffs to demonstrate").

Traceability and redressability are usually "flip sides of the same coin." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)). Traceability "requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" *Id*. (quoting *TransUnion*, 594 U.S. at 423). "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Id*. (quoting *All. for Hippocratic Med*., 602 U.S. at 381).

Although it is a close call, the Court finds that Plaintiffs have plausibly alleged a theory of injury that is fairly traceable to the merger, and that would be redressable by divestiture. Fundamentally, Plaintiffs' theory is that the merger will increase concentration in the market for steel manufacturing in the United States, which will increase the price of steel and "have a ripple effect . . . through critical consumer goods" that Plaintiffs buy. FAC at 3. Plaintiffs' connection to the steel market is far too attenuated for purposes of antitrust standing, *see infra* § III.B.1., but Article III traceability does not require Plaintiffs to establish that their injuries are proximately caused by the merger. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). Instead, courts assessing traceability and redressability account for "commonsense economic realities" and make "commonsense economic inferences about the operation of" the market. *Diamond Alt.*

*Energy*, 606 U.S. at 116, 120.  It is not implausible to infer that a price increase in the primary market for steel may "cause downstream . . . economic injuries to others in the chain," *Diamond Alt. Energy*, 606 U.S. at 117, including consumers of products that contain significant amounts of steel.  *See* FAC ¶ 51 ("Post-acquisition steel prices may increase affecting major United States industries that rely on steel materials . . . and, ultimately, consumers like Plaintiffs.").[2]  It follows that this injury is redressable by divestiture of the merger, which would restore the market to its pre-merger condition.

Accordingly, the Court finds that Plaintiffs have plausibly alleged Article III standing at this early stage, though they would likely face significant challenges in proving traceability at later stages in the case.  *See DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024).

### B.    Plaintiffs' Clayton Act § 7 Claim

Defendants contend that Plaintiffs fail to state an antitrust claim because they lack antitrust standing and because the complaint does not plausibly allege anticompetitive effects arising from the merger.  The Court agrees on both issues.

### 1.    Antitrust Standing

"Antitrust standing is distinct from Article III standing.  A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 n.3 (9th Cir. 1999) (citation omitted).  Section 16 of the Clayton Act permits a private plaintiff to obtain injunctive relief for a Section 7 violation upon showing "threatened loss or damage."  15 U.S.C. § 26; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986) ("[A] plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury[.]").

To establish antitrust standing, the plaintiff must show that its loss or damage constitutes "antitrust injury" – that is, injury "of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt.*, 190 F.3d at 1055 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334

---

[2] To be sure, some of Plaintiffs' anticipated harms are too attenuated to plausibly allege traceability.  For example, Plaintiffs allege that they "travel by air, train, ship and other transportation means that utilize steel."  FAC ¶ 13.  It is entirely speculative that an airline would increase ticket prices due to a price increase of one input used in manufacturing an airplane.

United States District Court
Northern District of California

(1990)).  "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."  *Id*. at 1057.  By contrast, "[p]arties whose injuries . . . are experienced in another market do not suffer antitrust injury."  *Id*.; *see also Bakay v. Apple Inc.*, No. 24-5314, 2025 WL 3012822, at *2 (9th Cir. Oct. 28, 2025); *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained.").

Here, Plaintiffs fail to plausibly allege antitrust injury, thus they lack antitrust standing.  Plaintiffs allege that "manufacturing, distribution and sale of steel and steel products is the relevant product market" and the "relevant geographic market is the United States."[3]  FAC ¶ 46.  But no Plaintiff participates in this relevant market, directly or indirectly, "either as a consumer or a competitor."  *Malheur Forest Fairness Coal. v. Iron Triangle, Inc.*, 164 F.4th 710, 733 (9th Cir. 2026).  Plaintiffs do not buy steel directly from U.S. Steel or any other steelmaker, nor do they buy steel indirectly from customers of steelmakers, such as steel refineries.  Instead, Plaintiffs are "indirect consumers of the goods that are made with" steel.  Opp. at 7, ECF No. 74; *see also id*. at 8 (describing Plaintiffs as "regular consumers of the goods that are made with" steel).  Thus, Plaintiffs participate in myriad other markets that are distinct from the claimed relevant market for steel manufacturing – including purported markets for buildings and infrastructure, mechanical equipment, cars, shipping, household appliances, utensils, tools, and electrical equipment.  FAC ¶ 23.  "Because these markets are distinct, Plaintiffs have not alleged antitrust injury."  *Hogan v. Amazon.com, Inc.*, No. 24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025).

[3] Defendants contest the plausibility of this relevant market.  *See* Mot. at 15-16.  To the extent Plaintiffs allege a market for "steel products" that includes any product that contains steel, such a market is plainly implausible.  *See Gamboa v. Apple Inc.*, 808 F. Supp. 3d 951, 964-67 (N.D. Cal. 2025) (explaining that market definition turns on whether products are economic substitutes).  Moreover, a market that includes every consumer product containing steel is not relevant to assessing the competitive effects of a merger between two steelmakers that do not make consumer products.  Finally, Plaintiffs have not alleged any details about competition in a market that contains all "steel products," which is independently fatal to their claim.  However, at the hearing, Plaintiffs clarified that the market definition in the amended complaint does not differ from the one previously alleged.  Hr'g Tr. 14:16-20, ECF No. 81.  Thus, the Court assumes without deciding that steel manufacturing in the United States is a plausible relevant market.

United States District Court
Northern District of California

There is no telling how far removed any particular Plaintiff is from "the market where competition is being restrained." *Am. Ad Mgmt.*, 190 F.3d at 1057. As Plaintiffs acknowledge, the purported anticompetitive effects in the steel market would reach Plaintiffs only indirectly, as "a ripple effect through critical consumer goods" that Plaintiffs purchase in various other markets. FAC ¶ 31. Within each of these separate markets, the potential harm to the Plaintiffs is varied and attenuated. For example, Plaintiffs allege that they "own or rent homes constructed with multiple steel products and travel by air, train, ship and other transportation means that utilize steel." FAC ¶ 13. Plaintiffs also try to forge a connection to the primary market for steel manufacturing through purchases of products like canned seltzer water, lamps, fans, hammers, metal yard art, a hip replacement, and "55-gallon steel drums containing acrylic paint products." *Id*. ¶ 30. The point of citing these examples is not to slight these purchases or trivialize the very real effect of price inflation on Americans' pocketbooks. Instead, the point is to emphasize that Plaintiffs participate in myriad markets disconnected from the primary antitrust market alleged in the complaint, in which steel itself is manufactured and sold.

Plaintiffs' distance from the market for the manufacture and sale of steel necessarily introduces complex questions into the case that distract from the primary issue – *i.e.*, the competitive effect of the merger. As a result, the Court would be left to answer questions such as: If the merger results in a higher price for steel, will a Plaintiff's landlord increase rent – and if so, by how much? Will a commuter bus service increase the fare of a ticket because the bus incorporates steel-based parts? One of the key purposes of the antitrust injury requirement is to avoid needlessly injecting these impossible questions into already complex cases. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543 (1983).

This is not a case lacking potential plaintiffs. The nation's great automakers, construction companies, and consumer product manufacturers – and many other companies – participate more directly in the market for steel. *See id.* at 545 (observing that the "existence of more direct victims" weighs against expanding antitrust standing to reach claims brought by indirect victims). These companies have sufficient incentive to challenge the merger if it is expected to raise prices, reduce output, or diminish quality and innovation for such a critical input as steel. But they did

not sue to block or unwind the merger.  Because these Plaintiffs lack antitrust standing, Defendants' motion to dismiss is GRANTED.

***

Before addressing the remaining issues raised in this motion, the Court briefly comments on another issue related to antitrust standing.  Defendants argued that Plaintiffs lack antitrust standing because "only *direct* purchasers have standing to seek damages for federal antitrust violations."  *See* Mot. at 17, ECF No. 32 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977)).  In *Illinois Brick*, which involved a claim for damages, the Supreme Court "established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers."  *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019).  In this case, the Court did not rely on *Illinois Brick*.  The dispositive issue here is not that Plaintiffs are indirect purchasers of steel.  The issue is that Plaintiffs do not buy steel at all – they purchase other products in separate markets.

The Ninth Circuit has observed that "*Illinois Brick* doesn't apply to equitable relief." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003).  However, it is worth re-examining whether this statement is consistent with other Ninth Circuit rulings, Supreme Court precedent, and general principles of economics and proximate causation.  *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) (affirming dismissal of injunctive relief claim under "the indirect purchaser rule in *Illinois Brick*"); *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234-35 (9th Cir. 1998) (analyzing antitrust standing for injunctive relief under the same principles that apply to a damages claim); *Cargill*, 479 U.S. at 112 ("It would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred."); *Pepper*, 587 U.S. at 291 n.1 (Gorsuch, J., dissenting) ("[I]t's hard to make sense of the suggestion that *Illinois Brick* may not apply to claims for injunctive relief" given that "a plaintiff who's not proximately harmed by a defendant's unlawful conduct has no cause of action to sue the defendant for any type of relief.").  Clarifying that *Illinois Brick* bars indirect claims for equitable relief would provide a useful and clear rule in cases like this one.

8

United States District Court
Northern District of California

## 2.    Anticompetitive Effects

"Section 7 of the Clayton Act generally prohibits business acquisitions whose effect 'may be substantially to lessen competition, or [to] tend to create a monopoly' in a relevant market." *Dehoog v. Anheuser-Busch InBev SA/NV,* 899 F.3d 758, 762 (9th Cir. 2018) (quoting 15 U.S.C. § 18). To make a prima facie case that a merger is anticompetitive, Plaintiffs must "adequately alleg[e] facts that an acquisition creates 'an appreciable danger' or a 'reasonable probability' of anticompetitive effects in the relevant market." *Id*. at 763 (first quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015); and then quoting *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)). "[T]he very wording of § 7 requires a prognosis of the *probable* future effect of the merger." *Brown Shoe Co. v. United States*, 370 U.S. 294, 332 (1962) (emphasis added). "Merely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market." *DeMartini v. Microsoft Corp*., 662 F. Supp. 3d 1055, 1065 (N.D. Cal. 2023) (citation omitted).

Here, Plaintiffs claim that the merger may lead to anticompetitive effects by eliminating U.S. Steel as an actual competitor, or by eliminating Nippon Steel as a potential competitor, in the market for steel manufacturing in the United States. *See* FAC ¶¶ 21-22, 25-26, 39, 50-52. The Court addresses these theories in turn.

### a.    Elimination of actual competition

Plaintiffs must plausibly allege that the probable effect of the merger may be substantially to lessen competition. *Dehoog*, 899 F.3d at 763. "Plaintiffs' general allegation that the merger may cause 'higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects' is insufficient." *DeMartini*, 662 F. Supp. 3d at 1062 (citation omitted).

Here, Plaintiffs' primary theory is that the merger will eliminate an actual competitor in the market for steel manufacturing in the United States. The premise of this theory is that Nippon Steel and U.S. Steel competed in this market prior to the merger, but now they have become one firm. This theory fails from the start because the complaint does not plausibly allege that Nippon

Steel competed in the market for steel manufacturing in the United States prior to the merger. On this point, Plaintiffs' allegations are ambiguous and contradictory. For example, Plaintiffs allege that "U.S. Steel was a significant rival of Nippon," Compl. ¶ 26a, but Plaintiffs do not specify that the two steelmakers were rivals *in the United States market*. Plaintiffs also allege that Nippon Steel has "a large presence in the United States." *Id*. ¶ 32. This conclusory allegation contradicts other allegations in the complaint, which suggest that Nippon Steel has not even entered the United States market.[4] *See, e.g.*, *id*. ¶ 24a (alleging that the merger "allowed Nippon to buy its way into new markets, rather than to enter them competitively").

Plaintiffs also argue that "[t]he merger of firms with significant market shares" by itself is sufficient to show that the merger is anticompetitive. Opp. at 18. The Supreme Court has instructed that "[t]he market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market." *Brown Shoe*, 370 U.S. at 343; *see also United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963) (emphasizing that courts should consider whether the "merger produces a firm controlling an undue percentage share of the relevant market"). However, market shares are "not conclusive indicators of anticompetitive effects." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974). Instead, courts must examine "the particular market – its structure, history and probable future." *Id*. (quoting *Brown Shoe*, 370 U.S. at 322 n.38).

Plaintiffs rely on several Supreme Court opinions to support their position that the merger is anticompetitive because it will increase the merged firm's market share and market concentration. For example, in *Brown Shoe*, the merging firms "had captured substantial portions" of the relevant markets and "the merger intensified this existing concentration." 370 U.S. at 343 (summarizing evidence that the merging firms achieved a combined share that

---

[4] The amended complaint adds vague allegations that, prior to the merger, "Nippon Steel had steel manufacturing facilities in the United States" that produced "steel products" that were "not sold under the Nippon brand name." FAC ¶ 7. At the hearing, Plaintiffs acknowledged that they did not know whether Nippon Steel actually manufactured steel in the United States prior to the merger. Hr'g Tr. 10:8-9 ("Whether they directly manufacture in the United States or not, we do not know.").

"exceeded 20%" and even "exceeded 40%" in certain local markets).  In *Philadelphia National Bank*, the merger would have "result[ed] in a single bank's controlling at least 30%" of the relevant market.  374 U.S. at 364.  In *United States v. Continental Can Co.*, the merger resulted in a merged firm controlling 25% of the relevant market.  378 U.S. 441, 461 (1964).  In *United States v. Aluminum Co. of America*, due to the merger, the market leader controlled 29.1% of the relevant market.  377 U.S. 271, 273-74, 278-80 (1964).  Finally, in *United States. v. Von's Grocery Co.*, "two of the most successful and largest" grocery chains "merged to become the second largest chain" in the relevant market.  384 U.S. 270, 277 (1966); *see also California v. Am. Stores*, 495 U.S. 271, 274 (1990) (defendant "more than doubled the number of supermarkets that it owns" by "merging with a major competitor").

These cases do not help the Plaintiffs here because the complaint is devoid of non-conclusory allegations about the probable effect of the merger in terms of market share or concentration.  As noted above, Plaintiffs do not allege that Nippon Steel and U.S. Steel were competing in the United States prior to the merger.  Thus, the combination of these two companies does not increase concentration in the market; instead, it simply substitutes Nippon Steel in as the owner of U.S. Steel.  Moreover, Plaintiffs have not alleged that the merged firm holds a significant market share.  Plaintiffs allege only that "U.S. Steel had a 6.09% market share relative to its competitors in the United States."  FAC ¶ 18.  But Plaintiffs do not allege Nippon Steel's share in the United States market prior to the merger, or that it had any share of steel manufacturing and sales in the United States at all.[5]  Without this information, the Court cannot infer how the merger will impact market shares or concentration.

In sum, Plaintiffs do not plausibly allege probable anticompetitive effects of the merger through the elimination of actual competition.

---

[5] Plaintiffs allege that the merger "will give Nippon an additional 6+ % share of the United States steel market."  *Id*. ¶ 49.  But characterizing this as "additional" share for Nippon Steel is sleight of hand, given the lack of allegation that Nippon Steel was already competing in the market.

United States District Court
Northern District of California

### b.    Elimination of potential competition

Plaintiffs also hint at another theory for challenging the merger:  the elimination of Nippon Steel as a potential competitor in the market for manufacturing steel in the United States. Plaintiffs allege that the merger "allowed Nippon to buy its way into new markets, rather than to enter them competitively."  FAC ¶ 26b.  The Supreme Court has recognized that a merger may be anticompetitive when the acquiring firm is "a potential competitor and likely to exercise substantial influence on market behavior." *United States v. Falstaff*, 410 U.S. 526, 531-32 (1973). "Entry through merger by such a company" may violate § 7 "because the entry eliminates a potential competitor exercising present influence on the market." *Id.*

For a potential competition theory to be viable, "[t]wo essential preconditions must exist": First, Nippon Steel must have "feasible means for entering" the market "other than by acquiring" U.S. Steel, and second, Nippon Steel's alternate means of entry must "offer a substantial likelihood of ultimately producing de-concentration of that market or other significant procompetitive effects." *United States v. Marine Bancorp.*, 418 U.S. 602, 633 (1974).  The Court previously observed that "Plaintiffs have not alleged any facts about Nippon Steel's intent, plans, or capabilities to enter the market for manufacturing steel in the United States through means other than the merger." MTD Order at *7.  In the amended complaint, Plaintiffs assert that Nippon Steel "was willing, ready and able" to enter and expand in the United States market.  FAC ¶ 25. These barebones allegations are insufficient to plausibly allege that entry through expansion was "feasible," and that the merger eliminated Nippon Steel as a potential competitor.[6]

Accordingly, because Plaintiffs do not plausibly allege any probable anticompetitive effects of the merger, the Court GRANTS Defendants' motion to dismiss for failure to state a Clayton Act § 7 claim.

---

[6] Plaintiffs do not argue that the merger would eliminate Nippon Steel as a "perceived competitor" – *i.e.*, one that is so "positioned on the edge of the market that it exert[s] beneficial influence on competitive conditions in that market." *Falstaff*, 410 U.S. at 532-33.  In any event, this theory is implausible because Plaintiffs do not allege that any steel manufacturer in the United States perceives Nippon Steel as a potential competitor.  To the contrary, Plaintiffs allege that steel prices have been rising over the past six years, FAC ¶ 42, which undermines an inference that Nippon Steel is currently perceived as a competitor that constrains steel prices in the United States.

United States District Court
Northern District of California

## C. Dismissal is Without Leave to Amend

The Court concludes that the complaint should be dismissed without leave to amend. In making this determination, the Court considers factors such as "undue delay, bad faith or dilatory motive on the part of the [plaintiff], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Court also considers "the number of times the plaintiff has already been allowed to amend." *Schwartz v. Miller*, 153 F.4th 918, 932 (9th Cir. 2025).

Here, the Court denies leave to amend primarily because amendment would be futile in light of the fundamental legal deficiencies in Plaintiffs' claims. *See Kroessler v. CVS Health Corp.*, 977 F.3d 803, 815 (9th Cir. 2020) ("If no amendment would allow the complaint to withstand dismissal as a matter of law, courts consider amendment futile."); *Lamoon, Inc. v. Lamour Nail Prods., Inc.*, 373 F. App'x 795, 797 (9th Cir. 2010) (When a plaintiff's "claims have underlying legal deficiencies that cannot be cured, amendment would be futile."). Plaintiffs have "failed to allege antitrust injury under [the Ninth Circuit's] market participation requirement," Plaintiffs have "been afforded an opportunity to cure this deficiency but failed to do so," and they also "have not identified any additional allegations that would cure their pleading deficiencies if they were afforded yet another opportunity to amend." *Hogan*, 2025 WL 869202, at *2 (affirming dismissal without leave to amend); *see also McCarthy v. Intercontinental Exch., Inc.*, No. 23-3458, 2024 WL 5040460, at *2 (9th Cir. Dec. 9, 2024) (affirming dismissal of first amended complaint without leave to amend due to lack of antitrust standing). Thus, dismissal without further leave to amend is appropriate.

Additionally, Plaintiffs' failure to cure pleading deficiencies after the Court previously granted leave to amend further supports that amendment would be futile. *See* MTD Order at *7-8 (granting leave to amend); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (holding that failure to correct pleading deficiencies after dismissal is a "strong indication" that further amendment would be futile); *see also Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A district court's discretion to deny

leave to amend is 'particularly broad' where the plaintiff has previously amended." (quoting *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996))).

Plaintiffs suggest that they need discovery, *see* FAC ¶ 7, to help them "nudge[] their claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). But when a complaint "fail[s] to satisfy Rule 8's plausibility standard," the court lacks "discretion to permit discovery" on the dismissed claims. *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014); *see also In re German Auto. Mfrs. Antitrust Litig.*, 335 F.R.D. 407, 409 (N.D. Cal. 2020) ("Once a court has found a plaintiff's complaint deficient under Rule 8, that plaintiff is no longer entitled to plausibility discovery."). Here, Plaintiffs' original complaint was dismissed for failure to state a claim, and the amended complaint remains deficient. The Court cannot permit Plaintiffs to take discovery to advance the case beyond the pleading stage.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. This case is dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: March 17, 2026

_____
Eumi K. Lee
United States District Judge

United States District Court
Northern District of California

14